IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN WRIGHT CROFT, SAMUEL )
E. CROFT JR., )
)                    2:20-CV-01430-CCW
)
Plaintiffs, )
)
v. )
)
DONEGAL TOWNSHIP, RICHARD )
FIDLER, TAMMI IAMS, RICHARD )
MARTIN, LANE TURTURICE, )
)
Defendants. )
)

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is the Motion for Preliminary Injunction filed by Plaintiffs Kathleen Wright Croft ("Ms. Croft") and Samuel E. Croft Jr. ("Mr. Croft") (collectively, "Plaintiffs"). ECF No. 25. Because the Court concludes, based on the record before it, that Plaintiffs have not carried their burden to demonstrate a likelihood of success on the merits on any of their claims, *see Reilly v. City of Harrisburg,* 858 F.3d 173, 176 (3d Cir. 2017), Plaintiffs' Motion will be DENIED.

## I.     Background

### A.     The Parties

Plaintiffs are residents of Defendant Donegal Township, Pennsylvania ("Donegal" or "the Township"). ECF No. 75 at ¶ 5. In 2017, Ms. Croft was elected to a four-year term on Donegal's Board of Supervisors. ECF No. 59 at ¶ 3. Her term as a Supervisor expires at the end of December 2021. *Id.* at ¶ 4. Both Ms. Croft and her husband Mr. Croft voted for Ms. Croft in the 2017 election. ECF No. 75 at ¶ 8.

Donegal is a Township of the Second Class under 53 P.S. § 65101, *et seq.,* and is governed by a five-member Board of Supervisors (collectively, the "Board"). ECF No. 59 at ¶¶ 1, 5. Ms. Iams, Mr. Fidler, and Mr. Martin are also elected members of Donegal's Board. *Id.* at ¶ 5. Ms. Iams was elected in 2017 along with Ms. Croft. *Id.* at ¶¶ 3, 6. Mr. Martin and Mr. Fidler were elected in 2019 and took office in January 2020. *Id.* at ¶ 7. The fifth member of the Board, who is not a party to this litigation, is Mr. Edward Shingle ("Mr. Shingle"). *Id.* at ¶ 5. Because Township residents voted in 2020 to reduce the Board from five members to three, the terms of all current Supervisors will expire at the end of 2021. ECF No. 76 at ¶ 6–7. Mr. Turturice was appointed by the Board to serve as Township Solicitor at the annual reorganizational meeting held on January 6, 2020 (the "Reorganizational Meeting"). ECF No. 59 at ¶ 9.

**B.     Relevant Procedural History**

Plaintiffs filed their original, four-count complaint on September 22, 2020, ECF No. 1, and moved for a preliminary injunction on October 12, 2020. ECF No. 4. After the Court held a status conference with the parties regarding Plaintiffs' original motion for preliminary injunction, ECF No. 20, Plaintiffs filed an amended complaint on November 3, 2020, ECF No. 24, and the present, renewed Motion for Preliminary Injunction, ECF No. 25, on November 6, 2020. The parties then engaged in a period of limited discovery related to Plaintiffs' Motion, which closed on January 6, 2021. *See* ECF No. 36. On January 14, 2021, Plaintiffs filed a consent motion for leave to further amend their complaint, ECF No. 49, which the Court granted, ECF No. 50, and Plaintiffs filed the operative Second Amended Complaint that same day. *See* ECF No. 51.

In their five-count Second Amended Complaint, Plaintiffs make claims against Defendants under 42 U.S.C. § 1983 and state law. Specifically, Plaintiffs allege that Defendants: (1) unlawfully retaliated against Ms. Croft for her outspoken views on local political matters, in violation of the First Amendment (Count I); (2) unlawfully discriminated against her because of

her political views, in violation of the Fourteenth Amendment's Equal Protection Clause (Count II); (3) unlawfully "deprived" Plaintiffs of their votes by impeding Ms. Croft's ability to perform her duties as an elected Supervisor for Defendant Donegal Township, in violation of the Fourteenth Amendment's Due Process Clause (Count III); (4) violated Pennsylvania's Second-Class Township Code (Count IV); and (5) violated Pennsylvania's Sunshine Act (Count V).

> In their Motion for Preliminary Injunction, Plaintiffs are seeking
>
> [A]n Order preliminarily enjoining Defendants from directly, indirectly or in any way excluding Plaintiff, Kathleen Wright Croft, from full participation in the affairs of the Board of Supervisors of Donegal Township; mandating that the "chain of command policy" be dissolved forthwith and that all deliberations of the Supervisors, whether in executive and/or in public session, include Plaintiff, Kathleen Wright Croft; directing that Plaintiff, Kathleen Wright Croft, be granted free uninterrupted and unfettered access to all books and records of Donegal Township; and declaring that Plaintiff, Kathleen Wright Croft, be entitled to enjoy the same rights, privileges and emoluments of her elected office as are the other four members of the Board of Supervisors of Donegal Township.

ECF No. 25 at 2. The Court held an evidentiary hearing on Plaintiff's Motion on January 27, 2021. *See* ECF Nos. 63, 73. In advance of the hearing, the parties submitted certain stipulations of fact, ECF No. 59, as well as proposed findings of fact and conclusions of law, ECF Nos. 57–58. At the hearing, Plaintiffs called Defendant Richard Fidler ("Mr. Fidler"), Defendant Richard Martin ("Mr. Martin"), Defendant Tammi Iams ("Ms. Iams"), Defendant Lane Turturice ("Mr. Turturice"), and Plaintiff Kathleen Wright Croft ("Ms. Croft") to testify; Defendants called Judith Taylor ("Ms. Taylor"). *See* ECF Nos. 53, 60. Each witness testified credibly. Following the hearing, the parties submitted amended findings of fact and conclusions of law, ECF Nos. 75–78, and Plaintiffs' Motion is now ripe for review.

## C.    Summary of Relevant Facts

Plaintiffs' claims arise from the fractious relationship between Ms. Croft and the alleged "majority" faction of Supervisors (the "Board majority"). According to Plaintiffs, after the 2019

election, Defendants Ms. Iams, Mr. Martin, and Mr. Fidler formed the "majority" faction of the five-member Board, and in conjunction with Mr. Turturice, who was appointed by the majority to serve as Township Solicitor, used their position to oppress and discriminate against fellow Supervisor Ms. Croft for publicly disagreeing with them over issues of Township governance. *See, e.g.*, ECF No. 26 at 1–2.  Plaintiffs claim that this oppression consisted of shutting Ms. Croft out of Board discussions and denying her access to important Township information.  *Id.*  Plaintiffs further allege that Defendants' actions had the effect of "depriving" Plaintiffs of their votes by preventing elected representative Ms. Croft from participating fully in the affairs of the Township. *Id.* at 10–11.  Finally, Plaintiffs claim that Defendants have violated Pennsylvania's Second Class Township Code, 53 P.S. §§ 65101, *et seq.,* and Sunshine Act, 65 Pa.C.S. §§ 701, *et seq.  Id.* at 2–4.

Here, the record shows that, although Ms. Croft has not always had access to information at the time and in the manner of her choosing, *see, e.g.,* ECF No. 75 at ¶¶ 54–57, 90–91, she is able, like the other Supervisors, to go to the Township offices, inspect records, discuss issues with her constituents, communicate with Township employees, and voice her opinion at public meetings and in executive session.  *See, e.g.,* ECF No. 76 at ¶ 162–165, 186–190, 192, 199. Plaintiffs point to the Township's so-called "chain of command" policy (allegedly embodied in Resolution 2019-2)[1] as having been used to silo Ms. Croft from Township information.  *See* ECF No. 26 at 5 (arguing that "the policy has had the effect of eliminating direct communication between Supervisor Wright Croft and the Township's employees").  However, Resolution 2019-2

---

[1] *See* Pl's Ex. 66.  Enacted by the 2019 Board of Supervisors, Resolution 2019-2 appoints individual supervisors to oversee township departments and purports to establish "rules and regulations" governing those oversight duties and regarding supervisor and employee access to certain Township information and computer terminals.  Defendants contend that Resolution 2019-2 had expired by the end of 2019, if not sooner.  *See* ECF No. 76 at ¶¶ 129–30.

was not reenacted in 2020 nor was any official action taken to enforce it in 2020. *See* ECF No. 76. at ¶ 142. That said, Township policy, which directed employees to route questions and issues to the Board through the Supervisor appointed to oversee an employee's department,[2] did not prevent Ms. Croft from speaking with township employees. *See id.* at ¶¶ 162–164. Finally, although Ms. Croft was not appointed to oversee a Township department in 2020, she held such positions in 2018 and 2019. *See id.* at ¶¶ 13–15.

Additionally, with respect to negotiations between the Township and the Donegal Township Police Association regarding renewal of the police union contract, Ms. Croft conceded that, although she wanted more regular and more detailed updates on the process, by the time the new contract came up for a vote in December 2020, Ms. Croft had been provided with the information she required and sufficient time to study it before casting her vote. *See id.* at ¶¶ 104–108. Indeed, Mr. Turturice provided periodic updates to the full Board over the course of the negotiations. *See id.* at ¶¶ 98–100. Relatedly, although Plaintiff claims to have been frustrated by Mr. Turturice in her attempts to obtain a copy of a Non-Disclosure Agreement ("NDA") signed by Mr. Fidler and Ms. Iams as part of the police union contract negotiations, Mr. Turturice offered to show Ms. Croft the document at his office or bring it to the Township building for her review. *See id.* at ¶¶ 64–70, 85. Ms. Croft, however, declined Mr. Turturice's offers. *See id.* at ¶ 95.

Next, Plaintiffs contend that the Defendants have used legal and administrative proceedings to harass her. *See, e.g.,* ECF No. 51 at ¶¶ 27, 37, 44–49. The first lawsuit, filed by Mr. Turturice on behalf of the Defendant-Supervisors, was brought to enjoin the 2019 board from

---

[2] This policy serves the purpose of streamlining communication, helping to avoid potential Sunshine Act violations (i.e. a quorum of a board of supervisors deliberating and/or taking action on agency business outside of a public meeting), allowing the overseeing supervisor to conduct an investigation of personnel issues while preserving the ability of the remaining supervisors to serve as impartial decisionmakers, and avoiding a situation where different individual supervisors provide conflicting responses to a given issue or question. *See* ECF No. 76 at ¶¶ 145, 147.

entering into a contract with the Police Association dues to various issues with its enforceability. *See* ECF No. 76 at ¶¶ 24–27. The second lawsuit, initiated when Mr. Turturice filed a writ of summons against Ms. Croft, was withdrawn without a complaint ever being served. *See id.* at ¶¶ 216–218. Finally, although Plaintiffs claim that a surcharge[3] brought against Ms. Croft by the Township's Board of Auditors was in retaliation for Ms. Croft's public disagreements with the Board majority, the evidence in the record does not indicate any real collaboration between the Defendants and the auditors, with the exception of Mr. Turturice providing limited procedural legal advice. *See* ECF No. 76 at ¶ 202–206. Indeed, although Ms. Croft's surcharge is the largest, all of the supervisors on the 2019 Board were surcharged. *Id.* at ¶ 213–14; *see also* ECF No. 51 at 44 (describing bases for surcharge against Ms. Croft).

Ms. Croft also claims that the Board majority intentionally singled her out by depriving her of information. *See, e.g.* ECF No. 26 at 4, 9. However, the record does not support that assertion. Rather, the evidence shows that procedural issues related to the flow of information—caused, in part, by the abrupt departure of the Township's former Secretary/Treasurer, Sharon Balach, and the ongoing COVID-19 pandemic—have been experienced by the Board generally. *See id.* at ¶¶ 115, 168, 195. For example, Mr. Martin testified that, despite being appointed to oversee the police department, he was left out of communications regarding police personnel issues. *See id.* at ¶¶ 149, 154, 157.

Finally, Plaintiffs contend that the Defendant-Supervisors and Mr. Turturice deliberated and made decisions about Township business outside of public meetings, specifically with regard to the Reorganizational Meeting, thereby depriving Ms. Croft of meaningful participation in

---

[3] Under Pennsylvania's Second Class Township Code, a surcharge is the "amount of any loss to the township caused in whole or in part by the officer's act or omission in violation of law or beyond the scope of the officer's authority." 53 P.S. § 65907(a).

Township affairs. *See* ECF No. 26 at 4. The record does reflect some coordination among the Defendants as it relates to Township business. For example, the Board majority used a different agenda, drafted by Mr. Turturice, than the one available to Ms. Croft and Mr. Shingle at the Reorganizational Meeting. *Compare* Defs.' Ex. OO *with* Defs.' Ex. PP. And, Mr. Fidler, Mr. Martin, and Ms. Iams all conceded that they spoke individually with each other and/or Mr. Turturice, about certain matters, but never met as a group. *See* ECF No. 76 at ¶ 35. However, with respect to the Reorganizational Meeting, the record reflects that the agenda drafted by Mr. Turturice provided only form language for certain motions—not pre-ordained votes—and was otherwise consistent with the agenda used by Ms. Croft and Mr. Shingle. *See id.* at ¶¶ 33, 41; *see also* Defs' Ex. OO.

## II.    Standard of Review

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008); *Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (courts should grant preliminary injunctions only in "limited circumstances"); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989). Four factors inform a court's decision as to the issuance of a preliminary injunction:

> (1) The likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) [that] the public interest [weighs in favor of granting the injunction.]
> \*\*\*
> Generally, the moving party must establish the first two factors and only if these "gateway factors" are established does the district court consider the remaining two factors. The court then determines "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."

*Greater Phila. Chamber of Commerce*, 949 F.3d at 133 (citations omitted)); *see also Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017) (citing *Del. River*

*Port Auth v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)); *Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc.,* 306 Fed.Appx. 727, 732 (3d Cir. 2009); 13 Moore's Federal Practice – Civil § 65.22 (2020).

To establish a likelihood of success on the merits, the movant must "demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not)." *Reilly*, 858 F.3d at 179; *see also*, 42 Am. Jur. 2d Injunctions § 18 (2020) (explaining that to obtain a preliminary injunction, the movant must show that it is "reasonably likely" to succeed on the merits.). That is, "the moving party must produce sufficient evidence to satisfy the essential elements of the underlying cause of action." *Sutton v. Cerullo*, Civil No. 3:CV-10-1899, 2014 U.S. Dist. LEXIS 110116, at * 13 (M.D. Pa. Aug. 8, 2014) (citing *Punnett v. Carter*, 621 F.2d 578, 582–83 (3d Cir. 1980)). And, the burdens of proof as to the substantive merits of a claim "track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418, 429 (2006).

## III. Discussion

### A. Plaintiffs Have Not Demonstrated a Likelihood of Proving the Alleged Retaliatory Conduct was Sufficient to Deter a Person of Ordinary Firmness.

At the core of Plaintiffs' claims is the charge that Defendants have engaged in a protracted (and ongoing) campaign of retaliation against Ms. Croft for her public disagreements with the Board majority. In short, Plaintiffs contend in their Second Amended Complaint that, in violation of Ms. Croft's First Amendment rights, the Board majority and Mr. Turturice systematically and deliberately retaliated against Ms. Croft by denying her access to township information and facilities, excluding her from the Board's decision-making process, and enforcing a so-called "chain of command" policy which inhibited her ability to communicate with Township employees. ECF No. 51 at ¶ 66.

To prevail on a First Amendment retaliation claim, a plaintiff must demonstrate "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal nexus between the constitutionally protected conduct and the retaliatory action." *Zimmerlink v. Zapotsky*, 539 Fed.Appx. 45, 48 (3d Cir. 2013) (citing *Thomas v. Independence Twp*., 463 F.3d 285, 296 (3d Cir. 2006)). Here, Plaintiffs have failed to present evidence sufficient to demonstrate a likelihood of success on the second element.

Because "the alleged retaliatory conduct must have had more than a de minimis impact on the plaintiff's First Amendment rights" to be actionable, "[w]here the alleged misconduct relates to the statements or actions of elected officials, the threshold is particularly high." *Willson v. Yerke*, 604 Fed.Appx. 149, 151 (3d Cir. 2015). Thus, "the First Amendment may well prohibit retaliation against elected officials for speech pursuant to their official duties only when the retaliation interferes with their ability to adequately perform their elected duties." *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 181 (3d Cir. 2015).

The United States Court of Appeals for the Third Circuit's opinion in *Zimmerlink* is particularly instructive here. In *Zimmerlink*, plaintiff, one of three elected county commissioners, alleged that defendants, the other two commissioners, had retaliated against her in violation of the First Amendment by, among other things, holding secret meetings, engaging in negotiations with third parties without plaintiff, and working to exclude plaintiff from county affairs. *See* 539 Fed.Appx. at 46. Affirming the district court's grant of summary judgment in favor of defendants, the court drew a distinction between "quotidian disputes among elected officials" and cases, such as *Monteiro v. City of Elizabeth*, 436 F.3d 397 (3d Cir. 2006), where retaliatory conduct actually prevented a legislator from speaking or involved formal punishment for his or her speech.

*Zimmerlink*, 539 Fed.Appx at 50 (discussing *Monteiro*, 436 F.3d at 400–01, and citing *Tenney v. Branhove*, 341 U.S. 367, 378 (1951) ("In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed.  Courts are not the place for such controversies.  Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses.")).

At a minimum, a plaintiff must show that the defendant's conduct substantially impaired the plaintiff-legislator's ability to perform her elected duties.  Plaintiffs have not shown that to be the case here.  Although the evidence before the Court shows that Ms. Croft may have had difficulty at times obtaining or accessing information she wanted, or receiving information as quickly as she wanted, the record does not reflect a likelihood that Plaintiffs can succeed in proving the level of exclusion and ostracization necessary to meet the "particularly high" threshold applicable to cases involving elected officials.  *Willson*, 604 Fed.Appx at 151.  For example, matters related to the police union contract negotiations highlight the shortcomings of Plaintiffs' evidence.  Although Ms. Croft may not have had access to all of the information she wanted exactly when she wanted it, *see* ECF No. 76 at ¶¶ 64 (seeking the NDA), 97 (seeking copy of chief of police job description), like other Supervisors not directly involved in the contract negotiations, Ms. Croft received periodic progress updates during Board executive sessions and she conceded that, by the time the contract was voted on by the Board in December 2020, she had been provided sufficient information, with sufficient time to consider it, to cast an informed vote.  Indeed, Ms. Croft voted to approve the new contract.  *See* ECF No. 76 at ¶¶ 104-08.

## B.      Plaintiffs Have Not Demonstrated a Likelihood of Proving There Was No Rational Basis for Defendants' Treatment of Ms. Croft.

In Count II of the Second Amended Complaint, Plaintiffs claim, under the Fourteenth Amendment's Equal Protection Clause, that Defendants' alleged practice of treating Ms. Croft

differently from the majority supervisors is wholly irrational and serves no legitimate government purpose. *See* ECF No. 51 at ¶ 68. Plaintiffs do not contend that any alleged differential treatment of Ms. Croft was based on her membership in any protected class (i.e., race, gender, religious affiliation); as such, Plaintiffs are proceeding on a "class-of-one" theory. *See* ECF No. 26 at 10.

To maintain an equal protection claim under the class-of-one theory (i.e. where no suspect classification is in play), "a plaintiff must allege that (1) the defendant treated [her] differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Bor. of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006) (discussing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). The "rational basis" standard is very deferential and is satisfied "'if there is any reasonably conceivable state of facts that could provide a rational basis' for the differing treatment." *Newark Cab Assoc. v. City of Newark*, 901 F.3d 146, 156 (3d Cir. 2018) (quoting *United States v. Walker*, 473 F.3d 71, 77 (3d Cir. 2007)).

Again, the *Zimmerlink* decision guides the Court's analysis here. Like Plaintiffs, the plaintiff in *Zimmerlink* pursued a class-of-one Equal Protection claim in addition to her First Amendment retaliation claim, alleging that the defendant-commissioners' differential treatment of her had no rational basis. Affirming the grant of summary judgment in defendants' favor, the Third Circuit found that plaintiff's Equal Protection claim was defective because it was "functionally identical" to her retaliation claim and that "in this case, the dispute in question is a political one, and Zimmerlink has provided no basis to conclude that it is irrational that a politician would treat a political ally differently than a political opponent." 539 Fed. Appx. at 50.

The same is true here. According to Plaintiffs, the breach between Ms. Croft and the Board majority stems from Ms. Croft's ongoing disagreement with the Board majority over issues related

to Township government, including, among other things, her persistent lobbying for greater transparency and disputes over policing.  *See* ECF No. 26 at 1;  ECF No. 75 at ¶¶ 6–7, 9, 12–14, 30–31.  Such issues—having to do with the way a government body functions and its relationship to its constituents—are quintessentially political matters.  As such, Plaintiffs have not demonstrated a likelihood of success on the merits of their Equal Protection claim in Count II.

### C.   Plaintiffs Have Not Demonstrated a Likelihood of Proving They Were "Deprived" of Their Votes.

Asserting a claim under the Due Process Clause of the Fourteenth Amendment, Plaintiffs allege in Count III of the Second Amended Complaint that by virtue of the alleged retaliatory conduct, Defendants "have effectively denied Plaintiffs of their vote."  ECF No. 51 at ¶ 72.  In their Motion,[4] Plaintiffs assert that this claim finds footing in the Supreme Court's "famous 'one-man, one vote' decision" in *Baker v. Carr*, 369 U.S. 186 (1962).  ECF No. 26 at 10–11.

Broadly speaking, *Baker* was a case about whether federal courts could adjudicate a case in which plaintiffs alleged that their votes were diluted by a state's legislative apportionment scheme.  *See Baker,* 369 U.S. at 187–88.  In holding the federal courts had jurisdiction and that such disputes are justiciable, the Court found that "[a] citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution" in situations involving false tallies, refusals to count votes from certain precincts, and ballot-box stuffing.  *Id*. at 208 (citations omitted).  But *Baker* speaks about a "right to a *vote* free from arbitrary impairment," *id.*, and Plaintiffs have introduced no evidence that their *votes* were in any way tampered with or impaired.  Indeed, the facts here—specifically that Plaintiffs voted for Ms. Croft and she was, in fact, elected—demonstrate the opposite.

---

[4] Note that, in the Brief in Support of their Motion, Plaintiffs appear to instead frame Count III as arising under the Equal Protection Clause.  ECF No. 26 at 10–11.

Presented with a virtually identical claim in *Smith v. Twp. of Alleppo*, 05cv0071, 2005 U.S. Dist. LEXIS 45262 (W.D. Pa. Apr. 12, 2005), the court, granting summary judgment in favor of the defendants, found that:

> Citizens may elect a member of a legislative body whose voice is ruthlessly muffled by the majority, but that does not mean that the voters' [sic] were denied any equal protection or due process right to "one right [sic] one vote" as with an unconstitutional apportionment. It is not the process of election that is denied its due, in that case, but the political will of the electors whose redress is at the ballot, not in the Courts, *on that issue.*

*Id.* at *4 (emphasis original). The same is true here. Indeed, even accepting Plaintiffs' framing of their claim—namely, that retaliation against a lawmaker by her colleagues gives rise to an Equal Protection and/or Due Process claim by her constituents—Plaintiffs have not demonstrated a likelihood of success on the merits for the reasons discussed regarding Plaintiffs' First Amendment retaliation claim. That is, Plaintiffs have not shown a likelihood of succeeding in showing that Ms. Croft's ability to perform her elected duties was actually impaired as a result of Defendants' conduct.

### D. Plaintiffs Have Not Demonstrated a Likelihood of Success on Their State Law Claims.

Finally, in Counts IV and V of the Second Amended Complaint, Plaintiffs claim that certain of Defendants' actions violated Pennsylvania's Second Class Township Code (the "Code") and the Sunshine Act.[5] The Court has supplemental jurisdiction over these claims, *see* 28 U.S.C. § 1367(a), because the alleged violations of state law are closely related to Plaintiffs' constitutional

---

[5] In their Brief in Support of their Motion, ECF No. 26, Plaintiffs also raise alleged violations of Pennsylvania's Right to Know Law ("RTKL") in the context of alleged violations of the Code and the Sunshine Act. ECF No. 26 at 4. However, Plaintiffs do not purport to assert any claim under the RTKL in their Second Amended Complaint and, after reviewing both the Second Amended Complaint and Plaintiffs' Brief, the Court concludes that any claim related to alleged use/abuse of RTKL processes properly relates to Plaintiffs' First Amendment claim. *See* ECF No. 51 at ¶¶ 33–36; ECF No. 26 at 4 (arguing that "the Defendants utilize RTKL as a mechanism to burden Supervisor Wright Croft's ability to inform her vote.").

claims.  Because the Code and the Sunshine Act operate in tandem to define the scope and process for conducting Township business, these claims will be analyzed jointly.

> ### i.        Legal Framework

When Pennsylvania courts analyze alleged violations of the Code and/or the Sunshine Act, there is a "presumption of regularity and legality that obtains in connection with proceedings of local agencies." *Kennedy v. Upper Milford Twp. Zoning Hearing Bd.*, 834 A.2d 1104, 1123 (Pa. 2003) (citations omitted).  As such, the party challenging the act(s) of a local agency ultimately bears the burden of proving a violation.  *See Smith v. Twp. of Richmond*, 82 A.3d 407, 412 (Pa. 2013) (citing *Kennedy*, 834 A.2d at 1123).  Accordingly, Plaintiffs bear that burden here.

Under the Code, all official business must be transacted at a "public meeting" attended by at least a quorum of a municipality's board of supervisors.  53 P.S. § 65603.  While a quorum may be less than the full board of supervisors—with two members of a three member board and three members of a five member board constituting a quorum—an affirmative vote by a majority of the entire board is required to transact any business.  *Id.*  Although the Code does not define the term "public meeting," it defers regulation of "public meetings" to other provisions of Pennsylvania law.  53 P.S. § 65103.  And, although the Sunshine Act does not use the term "public meeting," it instead uses the term "open meetings" and stipulates that "[o]fficial action and deliberations by a quorum of the members of an agency shall take place at a meeting *open to the public* unless closed" pursuant to one of three enumerated exceptions.  65 Pa.C.S. § 704 (emphasis added).  A board of supervisors under the Code is among those bodies defined as an "agency" under the Sunshine Act. 65 Pa.C.S. § 704.  While not one of the enumerated exceptions to the Sunshine Act's "open meetings" requirement, "emergency meetings," defined as meetings called "for the purpose of

dealing with a real or potential emergency involving a clear and present danger to life or property," 65 Pa.C.S. § 703, do not require the usual advance notice to the public.  65 Pa.C.S. § 709(a).

The Sunshine Act further defines "deliberations" and "meetings," and distinguishes between "official action" and "administrative action."  65 Pa.C.S. § 703.  A "meeting" is "[a]ny prearranged gathering of an agency which is attended or participated in by a quorum of the members of an agency held for the purpose of deliberating agency business or taking official action."  *Id.*  "Official action" is defined to include "[r]ecommendations made by an agency pursuant to statute, ordinance or executive order";  "[t]he establishment of policy by an agency"; "[t]he decisions on agency business made by an agency";  and "[t]he vote taken by any agency on any motion, proposal, resolution, rule, regulation, ordinance, report or order."  *Id*.  "Administrative action," on the other hand, is defined as "[t]he execution of policies relating to persons or things as previously authorized or required by official action of the agency adopted at an open meeting of the agency," but specifically excludes deliberation of agency business.  *Id.*  Finally, "deliberation" is defined under the Sunshine Act as "[t]he discussion of agency business held for the purpose of making a decision."  *Id.*

Then, under the Code and the Sunshine Act, official action or deliberations must be conducted at an open (that is, public) meeting.  Unless one of the exceptions to the open meeting requirement applies, a quorum of agency members may not meet to deliberate on agency business. But, nothing in either statute prohibits less than a quorum of agency members from meeting to discuss agency business, nor does Pennsylvania law prohibit private meetings, including those at which a quorum is in attendance, held for the purpose of gathq 67ering information but not to deliberate or take official action.  *See Twp. of Richmond*, 82 A.3d at 415.

That said, official action taken by an agency outside of a public meeting may be invalidated by a court.  65 Pa.C.S. § 713.  However, because the Sunshine Act only permits the invalidation of "official action," where a private meeting is held and no action is taken, or official action taken at a private meeting is later ratified by the agency at a proper public meeting, "the General Assembly has provided no remedy…beyond summary criminal proceedings against the members involved."  *Twp. of Richmond*, 82 A.3d 407, 414 n.8 (Pa. 2013) (citing *Ackerman v. Upper Mt. Bethel Twp.*, 567 A.2d 1116, 1120 (Pa. Commw. Ct. 1989) ("Although the Sunshine Act's purpose is to discourage private meetings on agency business followed by rubberstamp public hearings, the legislature has apparently provided no remedy to achieve this purpose beyond summary criminal proceedings against agency members.")); *see also Kennedy*, 834 A.2d at 1125 (noting that 65 Pa.C.S. § 710.1(b) "makes invalidation unavailable as a remedy where the meeting's only violation is a failure to provide a reasonable opportunity for comment by residents and taxpayers"). That said, Pennsylvania courts have found that even if a complaint alleging violations of the Sunshine Act is untimely, *see* 65 Pa.C.S. § 713 (requiring challenge to be filed within 30 days of a public meeting or within 30 days of discovery of action not taken at a public meeting, but no longer than one year after the challenged action), actions in violation of the Code may still be voided if not later ratified by the agency.  *See, e.g., Thomas v. Twp. of Cherry*, 722 A.2d 1150, 1153–1154 (Pa. Commw. Ct. 1999).

### ii.    Analysis

Based on the foregoing framework, Plaintiffs have failed to carry their burden at the preliminary injunction stage to demonstrate a likelihood of success on the merits.  In the Second Amended Complaint, Plaintiffs specifically allege the following violations of the Code and the Sunshine Act, *see* ECF No. 51 at ¶¶ 75, 79:

1. That the Board majority used a different agenda at the Reorganizational Meeting than Ms. Croft and Mr. Shingle, *id.* at ¶ 28;

2. That Mr. Fidler and Ms. Iams, in coordination with Mr. Turturice, filed a complaint against the police union, *id.* at ¶ 30;

3. That Mr. Fidler and Ms. Iams entered into the NDA on behalf of the Township without any vote being taken on the matter at a public meeting, *id.* at ¶ 32;

4. That under the so-called "chain of command" policy, "fewer than all members of the Board, at times not even amounting to a quorum, are authorized to transact business." ECF No. 51 at ¶ 75(b);

5. That the Board majority failed to "giv[e] notice to Mrs. Wright Croft, a member of the Board, of their intention to discuss official Township business and transact business," *id.* at ¶75(c);  and

6. That the Board's December 16, 2020, meeting was not a *bona fide* "emergency meeting" because it involved deliberations and actions related to funding of payroll, *id.* at ¶ 79.

First, although Plaintiffs appear to assert that merely using a different agenda was in violation of the Code, the crux of their argument appears to be that the Board majority and Mr. Turturice "coordinated" in advance of the Reorganizational Meeting, and in so doing effectively took "action" on Township business in a private setting, outside of the public eye and without notice to or input from Ms. Croft or Mr. Shingle.  But, while the record suggests that there were some communications between members of the Board majority in advance of the Reorganizational Meeting—e.g., Ms. Iams sent Mr. Turturice a template agenda and Mr. Fidler testified that he spoke, individually, to Ms. Iams and Mr. Martin about their votes for chairperson, *see,* ECF No. 76 at ¶¶ 33–36—video from the Reorganizational Meeting submitted into evidence by Plaintiffs, *see* ECF No. 63-1 (Pls' Ex. 1 to January 27, 2021, evidentiary hearing) shows that the substantive motions listed on the majority's "script" agenda were made, debated, and voted on by the Board in a public meeting, with ample opportunity for public comment.  *See also* ECF No .76 at ¶¶ 44–45.  Thus, because the official actions taken by the Board at the Reorganizational Meeting were in

the context of a public meeting, even if the Board majority's communication before the meeting was a violation, invalidation is not an available remedy. *See Twp. of Richmond*, 82 A.3d 407, 414 n.8 (Pa. 2013).

Second, Mr. Fidler and Ms. Iams were specifically authorized by the Board at the Reorganizational Meeting to initiate legal proceedings against the police union. *See* Pls' Ex. 65. As such, the Court finds that the filing of the complaint was an "administrative action," as opposed to an "official action," because it had been previously authorized by an official action of the Board taken at a public meeting.

Third, Ms. Iams and Mr. Fidler entering into the NDA, purportedly on behalf of the Township, also appears to have been within the scope of the authority delegated to them by the Board to renegotiate the police contract. That is, the Board passed a motion at the Reorganizational Meeting directing Ms. Iams and Mr. Fidler to "talk with police and try to work on [a] contract and if not successful take legal action." S*ee* ECF No. 76 at ¶ 48. Thus, although not specifically addressed in the motion, agreeing to non-disclosure of the contents of the negotiations appears to the Court to be within the scope of the delegation to Ms. Iams and Mr. Fidler to "talk with police and try to work on [a] contract." Furthermore, even if entering into the NDA was done in violation of the Code or the Sunshine Act, the NDA by its own terms has expired. *See id.* at ¶ 62. As such, any alleged violation of the Code or Sunshine Act in connection with the NDA is not a proper basis for a preliminary injunction. *See, e.g., Freedom Med. Inc. v. Whitman,* 343 F.Supp.3d 509, 530 (E.D. Pa. 2018) ("Simply put, a showing of past harm, without more, is insufficient to justify the issuance of a preliminary injunction.") (citation omitted).

Fourth, even assuming that Resolution 2-2019 is still in effect (which Defendants dispute), the so-called "chain of command" policy only authorizes an individual supervisor to exercise

oversight with respect to day-to-day operations of a given department of the Township and directs the individual supervisor to refer matters for consideration by the Board. *See* Pls' Ex. 66. Furthermore, Resolution 2-2019 does not purport to authorize individual supervisors to take official action on behalf of the Township. *Id.* Rather, Resolution 2-2019 specifically bars an individual supervisor charged with oversight of a department from entering into contracts or performing municipal functions without prior approval of the Board. *Id.* Finally, it does not appear to the Court that there is any evidence in the record of an individual supervisor (or group of supervisors) taking official action on behalf of the Township pursuant to their authorization to oversee a given department.

Fifth, the allegation that the Board majority did not give Ms. Croft "notice" of the majority's intention to discuss and transact Township business is too vague a basis on which to ground a preliminary injunction. Neither the Code nor the Sunshine Act prohibits less than a quorum of members of an agency from privately discussing agency business. And, while as noted above, it appears that members of the Board majority communicated with each other in advance of the Reorganizational Meeting, Plaintiffs have not presented evidence that a quorum of the Board met to deliberate on Township business or take official action. *See* ECF No. 76 at ¶ 37.

Sixth, and finally, according to evidence presented at the evidentiary hearing on Plaintiffs' Motion, the December 16, 2020, emergency meeting was called in connection with the Pennsylvania Governor's declaration of a state of emergency related to a major snow storm and to deal with a potential shortfall in the Township's general fund relative to imminent payroll disbursements. *See* ECF No. 76 at ¶¶ 224–28. No public notice was provided in advance of the meeting, *see id.* at ¶ 230, but the Sunshine Act provides that public notice is not required for an emergency meeting. *See* 65 Pa.C.S. 709(a). Furthermore, the threat posed by the snow storm falls

within the scope of the Sunshine Act's "emergency meeting" provision, *see* 65 Pa.C.S § 703, and Plaintiffs have not pointed to any authority (nor is the Court aware of any) indicating that an impending failure to meet an agency's financial obligations does not constitute "a real or potential emergency involving a clear and present danger to…property." *Id.*

In sum, then, based on the record before it, the Court concludes that Plaintiffs have not carried their burden to show a likelihood of success on the merits of their state law claims.

IV.    **Conclusion**

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction is hereby DENIED.


DATED this 23rd day of March, 2021.


BY THE COURT:


/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge




cc (via ECF email notification):

All Counsel of Record